# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| DAVID MASEL, M.D.; DINESH CHANDIRAMANI; NEURON SHIELD, LLC; NEURON SHIELD PARTNERS I, LP; NEURON SHIELD 2, LLC; NEURON SHIELD PARTNERS 2, LP; NEURON SHIELD 3, LLC; NEURON SHIELD PARTNERS 3, LP; NEURON SHIELD 4, LLC; NEURON SHIELD PARTNERS 4, LP; NEURON SHIELD 7, LLC; NEURON SHIELD MONITORING ASSOCIATES, PLLC; NEURON INTEGRITY TEXAS, PLLC; NEURON INTEGRITY 1, PLLC; NEURON INTEGRITY PARTNERS, LLC; NEURON SHIELD MONITORING ASSOCIATES PC; and NEURON SHIELD 9, LLC<br><br>      *Plaintiffs*,<br><br>    v.<br><br>ADRIANNA VILLARREAL; ANTHONY CASAREZ; MEDICAL PRACTICE SOLUTIONS, LLC; IOS MANAGEMENT SERVICES, LLC; CGR INVESTMENTS, LLC; and U.S. MONITORING, INC.<br><br>      *Defendants*. | Civ. Action No. _____<br><br><br><br><br><br><br><br><br><br><br><u>**ORIGINAL COMPLAINT**</u><br>**JURY TRIAL REQUESTED** |

## TO THE JUDGE OF THIS HONORABLE COURT:

This matter involves a classic case of inveterate fraud. Defendants Adrianna Villarreal and Anthony Casarez made promises to Plaintiffs David Masel, M.D., and his business partner Dinesh Chandiramani, *that they knew were false at the time*, in order to

induce Plaintiffs to sell the Defendants financial interests that qualify as securities under Federal and State law. Plaintiffs' benefit-of-the-bargain damages reach upwards of $50,000,000, before considering punitive damages.

Unfortunately, the Plaintiffs took the bait, which was not surprising given the hype that Defendants put into their lies. But once the truth began to surface, Defendants embarked on a pattern and practice of deceit, committing wire fraud, mail fraud, financial institution fraud, and theft of trade secrets, in violation of the federal anti-Racketeering statutes ("RICO"). The pattern of activity included tortious interference, breaches of fiduciary duty, and breaches of contract as Defendants set up new parallel businesses and steered business away from Plaintiffs, stole Plaintiffs' business opportunities, misused the financial arrangements over which they were entrusted to enrich themselves, and failed to actually do the billing that they promised to do.

These actions culminated in the destruction of a business enterprise that was worth well over $10,000,000 to Plaintiffs. Plaintiffs now bring this lawsuit to seek redress for the injuries they suffered because of the Defendants' bad acts.

## I.

## PARTIES

### Plaintiffs

1.      Plaintiff David Masel, M.D. is a resident of Dallas County, Texas.

2.      Plaintiff Dinesh Chandiramani is a resident of Collin County, Texas.

3.      Plaintiff Neuron Shield, LLC is Texas limited liability company.

4.      Plaintiff Neuron Shield Partners 1, LP is a Texas limited partnership.

5.      Plaintiff Neuron Shield 2, LLC is Texas limited liability company.

6.      Plaintiff Neuron Shield Partners 2, LP is a Texas limited partnership.

7.      Plaintiff Neuron Shield 3, LLC is Texas limited liability company.

8.      Plaintiff Neuron Shield Partners 3, LP is a Texas limited partnership.

9.      Plaintiff Neuron Shield 4, LLC is Texas limited liability company.

10.     Plaintiff Neuron Shield Partners 4, LP is a Texas limited partnership.

11.     Plaintiff Neuron Shield 7, LLC is a Texas limited liability company.

12.     Plaintiff Neuron Shield Monitoring Associates, PLLC is a Texas professional limited liability company.

13.     Plaintiff Neuron Integrity 1, PLLC is a Texas professional limited liability corporation.

14.     Plaintiff Neuron Integrity Texas, PLLC is a Texas professional limited liability corporation.

15.     Plaintiff Neuron Integrity Partners, LLC is a Texas limited liability corporation.

16.     Plaintiff Neuron Shield Monitoring Associates PC is a New Mexico professional company.

17.     Plaintiff Neuron Shield 9, LLC is a New Mexico limited liability company.

Defendants

18.     Defendant Adriana Villarreal is a resident of Collin County, Texas. She may be served with process at her usual place of business at 4100 W. 15th St., Suite 220, Plano, Texas 75093.

19.     Defendant Anthony Casarez is a resident of Collin County, Texas. He may be served with process at his usual place of business at 4100 W. 15th St., Suite 220, Plano, Texas 75093.

20.     Defendant Medical Practice Solutions, LLC ("MPS") is a Texas limited liability company doing business in the State of Texas. MPS's primary place of business is located at 4100 W. 15th St., Suite 220, Plano, Texas in Collin County. MPS may be served with process by serving its registered agent, Adriana Villarreal, at 4100 W. 15th St., Suite 220, Plano, Texas 75093. Upon information and belief Ms. Villarreal owns 95% of MPS.

21.     Defendant CGR Investments, LLC ("CGR Investments") is a Texas limited liability company authorized and doing business in the State of Texas. CGR Investments may be served with process by serving its registered agent, Johnnie Almon, at 2100 W. 15th St., Suite 220, Plano, Texas 75093. On information and belief, Ms. Villarreal is a member of CGR Investments.

22.     Defendant IOS Management Services, LLC ("IOS Management") is a Delaware limited liability company authorized and doing business in the State of Texas. IOS Management may be served with process by serving its registered agent, Legalinc Corporate Services Inc., at 5850 Granite Parkway, Suite 215, Plano, Texas 75024. Ms. Villarreal owns IOS Management. On information and belief, Ms. Villarreal is a member of IOS Management. On information and belief, IOS Management is the successor in interest to CGR Investments.

23.     Defendant U.S. Monitoring, Inc. ("USMON") is a corporation with its primary place of business in St. Paul, Minnesota, USMON may be served with process by

serving its attorney, Tom Loonan, at 1809 Northwestern Avenue, Stillwater, Minnesota 55082.

## II.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1961 because one or more of Plaintiffs' claims against one or more defendants arises under the laws of the United States, and Plaintiffs are asserting a claim under the federal RICO statute. This Court also has subject matter jurisdiction under § 27 of the Securities Exchange Act of 1934 because claims asserted herein arise under § 10(b) of the 1934 Act, over which this Court has *exclusive* federal jurisdiction. This Court has subject jurisdiction over all other claims under 28 U.S.C. § 1967.

25.     At all times material to this Complaint, all Defendants regularly conducted substantial business within the State of Texas. Additionally, Defendants Villarreal and Casarez reside in the State of Texas, and Defendants MPS, IOS Management and CGR Investments are incorporated in, and maintain their primary place of business in, Texas. Defendants are thus subject to personal jurisdiction in Texas.

26.     Venue is proper in this district under 28 U.S.C. § 1391 and § 27 of the 1934 Act because a substantial part of the events or omission giving rise to Plaintiffs' claims occurred within this judicial district, and one or more Defendants reside in this District.

## III.

## THE FACTUAL BACKGROUND

### A. The Intra-Operative Monitoring Business

27.     Intraoperative monitoring, also commonly referred to as intraoperative neurophysiological monitoring (collectively "IOM"), involves the use of various neurological monitoring techniques, such as electromyography and electroencephalography to monitor a patient's nervous system during surgery.

28.     IOM is used most commonly in neurological surgical procedures where there is a significant risk of injury to the nervous system, such as brain and spinal surgeries.

29.     The purpose of IOM is to reduce the risk of surgical damage to the nervous system by providing an early warning of potential injury.

30.     IOM has a technical component and a professional component.

31.     The technical component of IOM is typically performed by health care providers with a Certification for Neurophysiological Interoperative Monitoring ("CNIM"). The surgeon performing the procedure is typically the person who chooses the CNIM to perform the IOM.

32.     The professional component is performed by a licensed physician, and involves a medical professional conducting evaluative functions based upon the CNIMs readings during the surgery.

33.     Adrianna Villarreal is the CEO and ninety-five percent owner of Medical Practice Solutions, LLC. MPS purports to specialize in assisting IOM providers manage, bill, and collect insurance claims for IOM technical and professional services.

B. **Defendants Defraud Plaintiffs**

34.     David Masel, M.D. is a neurosurgeon licensed to practice medicine in the State of Texas with thirty-two years of experience in his field.

35.     Through the course of his career, Dr. Masel has established relationships with numerous neurosurgeons and CNIMs in Texas and throughout the United States.

36.     Prior to moving to Dallas, Texas, Dr. Masel practiced medicine in El Paso. While there, Dr. Masel met Defendant Anthony Casarez, a CNIM who periodically performed IOM services during Dr. Masel's procedures.

37.      In the Spring of 2014, Dr. Masel ran into Mr. Casarez at the Baylor Scott & White Medical Center in Carrolton, Texas.

38.     Mr. Casarez told Dr. Masel that the IOM business was extremely profitable and that Dr. Masel could earn a substantial return on his time and money if he were to invest in an IOM company.

39.     Mr. Casarez asked Dr. Masel if he would be interested in meeting with Adrianna Villarreal, a business partner of Mr. Casarez's, to discuss the opportunity in further detail.

40.     In May 2014, Ms. Villarreal and Mr. Casarez met with Dr. Masel at the Corner Bakery at 2401 Preston Road in Plano, Texas to discuss the IOM opportunity.

41.     During this meeting Ms. Villareal represented to Dr. Masel that her billing company MPS was getting IOM claims paid from insurance companies at a higher rate than any other billing company.

42.     She explained that prior to starting MPS, she had worked at two health insurance companies: United Healthcare and Blue Cross Blue Shield.

43.     While working at these insurance companies, Villarreal purported to have learned policies and procedures and developed unique insight and expertise that allowed her to forecast claims payments at a far higher rate than others who did not know what she knew—what she termed her "secret sauce."

44.     At the meeting, Villarreal represented to Dr. Masel that because of her secret sauce, out-of-network claims submitted by MPS reimbursed $50,000 or more. She told Dr. Masel that MPS generated $20,000 or more in payments for the technical component of monitoring, and that she typically got much more, up to $50,000 for the professional component.

45.     Villarreal has since reiterated and reasserted this fact in sworn court testimony: i.e., that MPS is able to "get a higher percentage of revenue per claim compared to any other biller."

46.     In truth, however, the "secret sauce" is nothing more than random luck masquerading as talent.

47.     An overwhelming majority of the IOM claims paid nowhere near $50,000. In fact, most paid zero.

48.     Ms. Villarreal also told Dr. Masel that MPS's reimbursement cycle for out-of-network claims is around six months.

49.     Mr. Cazares agreed with and confirmed the veracity of these statements for Dr. Masel, essentially adopting them as his own.

50.     Excited about the prospects, Dr. Masel repeated these representations to his business partner, Mr. Chandiramani, and together they formed Neuron Shield, LLC, which was organized to exclusively provide IOM services throughout the United States.

51.     The statements—it would eventually turn out—were completely false and without basis, and were intentionally made to induce Dr. Masel and by extension, Mr. Chandiramani, to give up substantial portions of their businesses to the Defendants, and to lure the Defendants to set up an enterprise that Defendants could later steal.

52.     Over time, Plaintiffs would also form Neuron Shield Partners 1, LP; Neuron Shield 2, LLC; Neuron Shield Partners 2, LP; Neuron Shield 3, LLC;  Neuron Shield Partners 3, LP; Neuron Shield 4, LLC; Neuron Shield Partners 4, LP; Neuron Shield 7, LLC; Neuron Shield Monitoring Associates, PLLC; Neuron Integrity Texas, PLLC; Neuron Integrity 1, PLLC; Neuron Integrity Partners, LLC; Neuron Shield Monitoring Associates PC; and Neuron Shield 9, LLC (*collectively*, along with Dr. Masel, Neuron Shield, LLC, "Neuron Shield").

53.     Dr. Masel and Mr. Chandiramani relied on the misrepresentations made by Defendants Cazares and Villareal and ultimately would give up 8% of their payments to MPS and 35% of their Neuron Shield businesses through the sale of securities to them (or to their designees, MPS, CGR, or IOS).

54.     During the discussions that led to the formation of Neuron Shield, Villarreal and Casarez failed to disclose to Masel and Chandiramani that MPS had vested financial interests in scores of other IOM providers that would be competing with Neuron Shield.

55.     During the discussions Villarreal and Casarez failed to disclose to Masel and Chandiramani that they and MPS intended to set up competing businesses with other people and that they intended to redirect potential business away from Plaintiffs.

56.     In fact, when Dr. Masel inquired about MPS's potential conflicts of interest, Villarreal told him that MPS provided billing services to only one other IOM provider, which she described as "small."

57.     In a recent court hearing, however, Villarreal testified that MPS provided billing services to "109 or 110" IOM providers and stated that Neuron Shield was one of her "smaller clients."

58.     In reliance on the false representations that she could achieve collections of over $50,000 per procedure, Neuron Shield engaged MPS in July 2014 as its agent for billing and collection of claims made for the IOM services it provided.

59.     As part of the process, Villarreal and MPS established the rates that Neuron Shield charged for its services.

60.     In sworn testimony, Villarreal has admitted that MPS was also responsible for ensuring that Neuron Shield maintained "all aspects" of regulatory compliance.

61.     Neuron Shield and MPS never executed a written contract, however, a draft of the contract required Neuron Shield to pay MPS 8% of collections each month while the contract was in effect, which Neuron Shield did in fact pay MPS for the provided billing services.

62.     In furtherance of MPS's duties as Neuron Shield's billing agent, MPS utilized Defendant U.S. Monitoring, Inc. to provide specialized software designed to assist IOM providers with insurance billing and collections.

63.     The USMON software also serves as a database in which virtually all of Neuron Shield's patient billing and claims data is stored.

64.     The contract for USMON's services identifies "Neuron Shield via Medical Practice Solutions" as the client.

65.     The contract specifically names "USMON" and "Neuron Shield" as the parties.

66.     Villarreal executed this contract on behalf of MPS as Neuron Shield's agent—thus admitting that both she and MPS owed Neuron Shield fiduciary duties.

67.     After execution, USMON invoiced Neuron Shield for its software and database services, and Neuron Shield paid for those services out of Neuron Shield bank accounts.

68.     Villarreal and Casarez maintained the login credentials and administrative rights for Neuron Shield's account with USMON, rendering them effective trustees of the information and the data.

69.     As part of the consideration for the transaction, Dr. Masel sold IOS Management and CGR Investments, both which are solely owned by Villarreal, 35% interest in certain Neuron Shield entities.

70.     Neuron Shield, MPS, IOS Management, CGR Management, and USMON functioned as an enterprise (the "IOM Enterprise") with the lawful purpose of providing

IOM services throughout the United States, including Louisiana, Texas, New Mexico, Arizona, and South Carolina.

71.     Under the legal organization of the IOM Enterprise, Defendant IOS Management was in partnerships with Plaintiffs Neuron Shield Partners I, LP, Neuron Shield Partners 2, L.P., Neuron Shield Partners 4, LP, Neuron Integrity Partners, LLC, and Neuron Shield 9, LLC.

72.     CGR Investments was in a partnership with Plaintiff Neuron Shield Partners 3, LP.

73.     Under this arrangement, Ms. Villarreal and Mr. Casarez managed Neuron Shield's business and ran the day to day operations.

74.     In addition, Ms. Villarreal and Mr. Casarez served individually as officers of Neuron Shield.

75.     The Profits Interest Agreements that granted IOS Management and CGR Investments the 35% profit interest in Neuron Shield specifically recognize this interest as a "security" that requires compliance with the Securities Act, the Exchange Act, and their underlying regulations.

76.     Mr. Casarez and Ms. Villarreal were both given @neuronshield.com email accounts. Mr. Casarez was first given the title of Director of Operations at Neuron Shield and then Chief Financial and Operations Officer. As explained by Mr. Casarez in a May 6. 2016 email, "IM NOT AN EMPLOYEE THAT FOLLOWS POLICIES, I SET THEM. As far as it goes I'm the CEO. CFO, coo and anything that is needed so I can make this company function."

77.    Part of Mr. Casarez's responsibility included maintaining the Neuron Shield email server; as such, Mr. Casarez controlled the administrative login credentials.

78.    Likewise, Ms. Villarreal also wielded significant authority over Neuron Shield. For example, in a July 23, 2015, explicative-laced tirade, Ms. Villarreal proclaimed that she had plenary authority to direct and instruct Neuron Shield's attorneys.

79.    Between the 8% fee paid to MPS on all collections (regardless of profit) and IOS Management and CGR Investment's 35% stake in Neuron Shield, Plaintiff's gave the Defendant's a right to nearly half of Neuron Shield's profits in return for the services that the Defendant's promised they could offer.

## C. <u>The Defendants Scheme to Steal the Neuron Shield Business</u>

80.    Over the next two-and-half years, Neuro Shield, in conjunction with the IOM Enterprise, built its business and entered arrangements with surgeons across the United States to provided IOM services.

81.    Dr. Masel's established relationships with neurosurgeons and referral sources in the neurosurgical industry were critical to Neuro Shield's growth. Dr. Masel's relationships with neurosurgeons gave him an edge over other providers when competing to offer IOM services to these doctors.

82.    Dr. Masel's relationships paid off. In two and half years since it was established, Neuron Shield provided over $190 million in IOM services to patients undergoing surgical procedures, according to MPS's records.

83.    Ms. Villarreal promised a significant return on Neuron Shield's efforts. For example, on March 31, 2015, Dr. Masel asked Ms. Villarreal what percent of the accounts

receivable could be expected for MPS to recover. Ms. Villarreal responded, "I always say 50% but a lot of times its more ☺"

84.     About a month earlier, on February 27, 2015, Ms. Villarreal had repeated to Dr. Masel her lie that the "[r]eimbursement cycle takes about 6 months[.]"

85.     These fraudulent and untrue statements concealed the reality that MPS would get nowhere near those dollars in a 6-month timeframe—or ever.

86.     But they induced Plaintiffs to put in millions of dollars to pay salaries and overhead.

87.     MPS, CGR, and IOS directed CNIMs to perform cases—using hundreds of thousands if not millions of Plaintiffs' money to pay the CNIMs do so at the control and direction of Defendants—for cases that Defendants had no reason to believe would be reimbursed.

88.     Dr. Masel was willing to use his established contacts and share their identities with the Defendants in order to grow the IOM Enterprise because the Defendants promised a significant return on investment and never disclosed their intent to put Neuron Shield out of business and divert Neuron's Shield's customers and CNIMs to other IOM providers in which the Defendants had a financial stake.

89.     For example, in or around the Spring of 2016, Anthony Cazares, Dr. Masel and a third-party introduction from Dr. Masel's contacts met with a Dr. Silva who wanted to use Neuron Shield for IOM services—but Dr. Silva did not sign on with Neuron Shield.

90.     Instead, Dr. Masel later received a call inquiring why a Neuron Shield employed CNIM wearing a Neuron Shield uniform was doing cases for Dr. Silva, when

the bills were not going to Neuron Shield for Dr. Silva, but were going to an unknown and undisclosed entity.

91.    When Dr. Masel confronted Anthony Cazares about the discrepancy, Anthony admitted that he had redirected Dr. Silva to another business of his that was competing with Neuron Shield. He then renounced that he was an officer or director of Neuron Shield, explaining that as a "consultant" to Neuron Shield he had no conflict of interest, even though he held himself out as Neuron Shield's Director of Operations and then Chief Financial and Operations Officer.

92.    Cazares then threatened Dr. Masel by telling Dr. Masel "You know, I have deep connections in the Mexican Mafia."

93.    Dr. Masel would later discover that Defendants had been using CNIMs employed by and paid by Neuron Shield to perform services using machines that had been guaranteed by Dr. Masel, personally, for other competing IOM companies run or owned by them. And in order to shut down Neuron Shield entirely, on December 20, 2016, Defendants hired all the Neuron Shield CNIMs and placed them under non-disclosure agreements and forbade them from speaking to Dr. Masel or Mr. Chandiramani.

94.    Additionally, during this time frame, MPS billed several insurance companies for IOM services provided by Neuro Shield.

95.    But, MPS collected less than $11 million in total on the $190 million it was responsible for processing on Neuron Shields behalf, despite previously representing to Dr. Masel that Neuron Shield should expect to collect 50% of its accounts receivable and that the reimbursement cycle would take about 6 months.

96.     MPS was unable to collect any money at all on half of all claims it submitted on Neuron Shield's behalf.

97.     And in fact, MPS has collected less than 1% of the billed charges on over 75% of the claims it submitted on Neuron Shields behalf.



98.     Meanwhile, Plaintiffs continued to pay millions in salaries and overhead for Neuron Shield employees and machines.

99.     Most of money that MPS did collect came from just one insurance company—United Healthcare—where Villarreal use to work, despite that United Healthcare was the insurance provider for only a fifth of Neuron Shield's procedures.

100.    MPS net collection rate was roughly 6% of claims made—not 50% or more as promised.

101.    When the claims to United Healthcare are removed from the equation, MPS collection rate on behalf of Neuron Shield was only about 3% of claims made.

102.    In essence, the Defendants were engaged in a Ponzi scheme whereby they used their ability to get paid on claims submitted to United Healthcare to cover for their inability to get paid by other insurance companies.

103.    As part of its scheme, MPS routinely used email and mail to process insurance claims on Neuro Shield's behalf.

104.    The Defendants never disclosed to Plaintiffs that they would never receive any compensation on the majority of IOM cases they performed.

105.    In the meantime, Neuron Shield incurred significant costs, including the marketing costs and salaries paid to CNIMs associated with those cases.

106.    The Defendants used their ability to collect significant payments on a few of the claims to create the impression of success in order to buy time and cover up the fact that they could collect little to no money on the vast majority of claims.

107.    For instance, in an email to Dr. Masel, Ms. Villarreal bragged about the "Flawless 9 carat canary diamond" that she bought herself for her birthday, and then stated "Now let's make money! Oh wait today's deposit is amazing :)"

### D. **The Culmination of the Scheme to Destroy Neuron Shield**

108.    In the meantime, Villarreal and Casarez began forming other IOM companies to compete with Neuron Shield.

109.    For instance, Villarreal formed "NeuroSolutions LLC" in December 2015. And Casarez formed "Undisclosed IOM Inc." in May 2016—which true to its name, Casarez never disclosed to the Plaintiffs.

110.    In the Spring of 2016, the Ponzi-like scheme began to collapse and MPS's collections plummeted.

111.    When Dr. Masel and Mr. Chandiramani raised their concerns with Ms. Villarreal about MPS's collections rate, Ms. Villarreal retaliated by refusing to proceed with any further collections efforts unless Neuron Shield signed over a vested interest in the uncollected accounts receivable to MPS and agreed to a one-sided confidentiality agreement (that for all practical purposes would make it impossible for Neuron Shield to uses any other company for billing and collections).

112.    When Neuron Shield refused to acquiesce to this extortion, MPS, IOS Management, and CGR Investments unilaterally terminated their respective contracts with Neuro Shield.

113.    MPS then refused to turn over to Neuron Shield the complete claims files for Neuron Shield patients that MPS had in its possession and refused to provide Neuron Shield with access to the data in the USMON database.

114.    Neuron Shield's contract with USMON specifies that all of Neuron Shield's data captured in the USMON database belongs to Neuron Shield.

115.    The contract also requires USMON to provide Neuron Shield a copy of Neuron Shield data in MS Excel or ASCI format upon request. Neuron Shield has requested its data from USMON on multiple occasions.

116.    USMON, however, refuses to provide Neuron Shield with the data without MPS's permission or a court order, despite USMON's contractual obligation to turn over

the data and MPS's and Villarreal's fiduciary duty to make the data available to Neuron Shield.

117.    On information and belief, MPS and Villarreal have interfered with Neuron Shield's contractual relationship with USMON by threatening to pull business from USMON and sue them if they turned over the requested data to Neuron Shield.

118.    MPS's and USMON's refusal to turn over Neuron Shield's patient and claims data has left Neuron Shield unable to seek recovery for millions of dollars in insurance claims that MPS failed to recover.

119.    Without this source of revenue, Neuron Shield was forced to cease operations. In addition to denying Neuron Shield access to its patient data, Anthony Casarez refused to turn over the administrative login credentials for Neuron Shield's email server, which further hindered Neuron Shield's ability to conduct its business.

120.    Around the same time, the Defendants underhandedly began targeting Neuro Shield's surgeon-customers and partners, the identity of which Defendants knew because of their business relationship with Plaintiffs.

121.    Defendants diverted their referrals to other IOM companies in which the Defendants had a financial stake.

122.    In one instance, Casarez told one doctor who was a partner in Neuron Shield Partners II that Dr. Masel had been stealing from him, which was patently false.

123.    In another instance, Casarez falsely told another doctor, Dr. Cindrich, who had been a Neuron Shield affiliate and referring physician, that Innovations Monitoring, a

competing IOM service provider established by the Defendants, was "a part of Neuron Shield," in an attempt to convince that doctor to use Innovations Monitoring.

124.    Dr. Cindrich then used Innovations Monitoring until he was made aware of the fraud, at which time he terminated them.

125.    Once Neuron Shield was financially crippled, the Defendants also began recruiting Neuron Shield's CNIMs, the identity of which the Defendants knew because of their business relationship with Plaintiffs, to work at Neuron Shield competitors that Defendants had a financial interest in.

126.    To add insult to injury, the Defendants used IOM equipment paid for and guaranteed by Neuron Shield to provide IOM services for other monitoring companies.

127.    To make matters worse, on or about January 4, 2017, Adrianna Villarreal accessed Neuron Shield's bank accounts without authorization and transferred approximately $77,000 from Neuron Shield to MPS.

E. **Defendants Schemed to Defraud other IOM Companies**

128.    The Defendants' fraudulent scheme was not targeted solely at Neuron Shield. Other IOM providers have been the subject of Defendants' misdeeds, as well.

129.    A nearly identical set of tragedies befell a Dr. Scott Farley in Dallas.

130.    In 2014, MPS contracted to provide billing services Revolution Monitoring, another IOM provider headquartered in North Texas.

131.    MPS promised Revolution's founder and owner, that it would not provide services to any other IOM provider that performed less than 500 cases per month.

132.    MPS, however, broke its promise almost immediately.

133.    As discussed above, MPS has contracted with over 100 IOM providers many, if not most, of which perform less than 500 cases per month, including Neuron Shield.

134.    Defendants then intentionally disrupted Revolution Monitoring's business by deliberately interfering with its cash flow.

135.    For example, in October 2015, MPS claimed to have lost $1.2 million in insurance claims checks for services provided by Revolution Monitoring.

136.    Then from February 2016 through April 2016, MPS collected no revenue on Revolution Monitoring's behalf, despite that Revolution Monitoring had numerous claims outstanding.

137.    Then on April 15, 2016, MPS sent a notice of termination to Revolution Monitoring, again unilaterally claiming the right to continue collections.

138.    The foregoing demonstrates a concerted, intentional pattern and practice of inducing people into the IOM business, taking a large piece of the billing and management, and then using that to mine the business for contacts and other assets, cutting the partner loose, and then suing for damages before the other side knows what's happened.

## IV.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Fraud in Connection with the Purchase or Sale of Securities in
Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
(against Villarreal, Casarez, MPS, IOS Management, and CGR Investments)**

139.    Plaintiffs incorporate the allegations in paragraphs 1 – 138 as if fully set forth herein.

140.     This Count is against Defendants Villarreal, Casarez, IOS Management, and CGR Investments (the "Count One Defendants").

141.     In the Spring 2014, at the Baylor Scott & White Medical Center–Carrolton, Defendant Anthony Casarez pitched Dr. Masel on the opportunity to start an IOM business together.

142.     When Dr. Masel expressed interest in response to the pitch, Mr. Casarez arranged for Dr. Masel to meet with him his business partner Defendant Adrianna Villarreal.

143.     The three them met in May 2017 at the Corner Bakery at 2401 Preston Road in Plano to discuss the IOM opportunity.

144.     During this meeting Ms. Villareal bragged to Dr. Masel about MPS's ability to recover claims from insurance companies at a higher rate than other billing company based on her secret algorithm.

145.     She told Dr. Masel that MPS averaged $20,000 in payments per procedure for the technical component.

146.     Ms. Villarreal said that her average payment per procedure including the professional component was around $50,000-$75,000—a claim she repeated often thereafter to justify MPS's existence.

147.     Ms. Villarreal also told Dr. Masel that the reimbursement cycle for out-of-network claims is around six months.

148.     Indeed, on November 26, 2014, Ms. Villarreal bragged that MPS's "average out of network claim will reimburse around 50-75k."

149.    And on February 27, 2015, Ms. Villarreal copied Dr. Masel on an email where she claimed that the "[r]eimbursment cycle takes about 6 months for negotiations as all entities are billed out of network[.]"

150.    On March 31, 2015, Dr. Masel emailed Ms. Villarreal and asked, "What % of that A/R do you expect we collect?" Ms. Villarreal responded, "I always say 50% but a lot of times its more 😊"

151.    In reliance on Ms. Villarreal's and Mr. Casarez's representations, Plaintiffs Dr. Dr. Masel and Mr. Chandiramani formed the various Neuron Shield entities, entered into a business management and profits interest agreements, and sold a 35% security interest in those entities to Defendants IOS Management Services and CGR Investments.

152.    As it turned out, the representations made by Defendants were false. MPS has not collected $50,000-$75,000 per procedure. MPS has been able to collect less than 6% of the Neuron Shield's accounts receivable, instead of the 50% promised.

153.    Further, as stated by Ms. Villarreal in sworn Courtroom testimony, it takes MPS "anywhere from 12 to 18 months" to get a claim paid, instead of the 6 months she previously represented.

154.    In truth Villarreal had no "secret sauce" that would produce $50,000-$75,000 per procedure, yield 50% collections on accounts receivable, or result in a 6-month reimbursement cycle.

155.    The Count One Defendants knew these representations were untrue when they were made, but made them any to induce Plaintiffs to form the various Neuron Shield entities, enter into a business management and profits interest agreements, and sell a 35%

security interest in those entities to Defendants IOS Management Services and CGR Investments.

156.    The Count One Defendants employed a device, scheme, or artifice to defraud, made untrue statements or omissions of material facts, and engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

157.    CGR and IOS's interests in Neuron Shield were predicated on Villareal's misrepresentations being true; now that it is obvious that they were false, the sales of the securities were part of a scheme or artifice to defraud.

158.    But for these misrepresentations, Plaintiffs would not have sold the interests, or invested the moneys that amounted to millions for claims that would never be paid.

159.    Defendants knew that their representations were false because they were representing historical facts about their collection percentages, and presenting their collection rates, and the existence of proprietary "secret sauce" methods that achieved those incredible results as facts—facts which they alone had the access to know whether they were true or false.

160.    The Count One Defendants violated, and unless restrained and enjoined will in the future violate, Section 15(a)(1) of the Exchange Act.

## SECOND CLAIM FOR RELIEF
### Fraud in Connection with the Purchase or Sale of Securities in Violation of Section 33-B of the Texas Securities Act (against IOS Management and CGR Investments)

161.    Plaintiffs incorporate the allegations in paragraphs 1 – 160 as if fully set forth herein.

162.    This Count is against Defendants IOS Management and CGR Investments (the "Count 2 Defendants").

163.    In the Spring 2014, at the Baylor Scott & White Medical Center–Carrolton, Defendant Anthony Casarez pitched Dr. Masel on the opportunity to start an IOM business.

164.    When Dr. Masel expressed interest in response to the pitch, Mr. Casarez arranged for Dr. Masel to meet with him his business partner Defendant Adrianna Villarreal.

165.    The three them met in May 2017 at the Corner Bakery at 2401 Preston Road in Plano to discuss the IOM opportunity.

166.    During this meeting Ms. Villareal bragged to Dr. Masel about MPS's ability to recover claims from insurance companies at a higher rate than other billing company based on her secret algorithm.

167.    She told Dr. Masel that MPS averaged $20,000 in payments per procedure for the technical component.

168.    Ms. Villarreal said that her average payment per procedure including the professional component was around $50,000-$75,000, a claim she repeated often thereafter to justify MPS's existence.

169.    Ms. Villarreal also told Dr. Masel that the reimbursement cycle for out-of-network claims is around six months.

170.    Indeed, on November 26, 2014, Ms. Villarreal bragged that MPS's "average out of network claim will reimburse around 50-75k."

171.    And on February 27, 2015, Ms. Villarreal copied Dr. Masel on an email where she claimed that the "[r]eimbursment cycle takes about 6 months for negotiations as all entities are billed out of network[.]"

172.    On March 31, 2015, Dr. Masel emailed Ms. Villarreal and asked, "What % of that A/R do you expect we collect?" Ms. Villarreal responded, "I always say 50% but a lot of times its more 😊"

173.    In reliance on Ms. Villarreal's and Mr. Casarez's representations, Plaintiffs Dr. Dr. Masel and Mr. Chandiramani formed the various Neuron Shield entities, entered into a business management and profits interest agreements with Defendants, and sold a 35% security interest in those entities to Defendants IOS Management Services and CGR Investments.

174.    As it turned out, the representations made by Defendants were false.

175.    MPS has not collected $50,000-$75,000 per procedure, and upon information and belief, never did.

176.    MPS has never collected 50% of the AR as promised and represented.

177.    Further, as stated by Ms. Villarreal in sworn Courtroom testimony, it takes MPS "anywhere from 12 to 18 months" to get a claim paid, instead of the 6 months she previously represented.

178.    In truth Villarreal had no "secret sauce" that would produce $50,000-$75,000 per procedure, yield 50% collections on accounts receivable, or result in a 6-month reimbursement cycle.

179.    CGR and IOS's interests in Neuron Shield were predicated on Villareal's misrepresentations being true; now that it is obvious that they were false, the sales of the securities were part of a scheme or artifice to defraud.

180.    The Count 2 Defendants knew these representations were untrue when they were made, but made them any to induce Plaintiffs to form the various Neuron Shield entities, entered into a business management and profits interest agreements, and sold a 35% security interest in those entities to Defendants IOS Management Services and CGR Investments.

181.    The Count 2 Defendants offered to buy and bought a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

182.    Defendants knew that their representations were false because they were representing historical facts about their collection percentages, and presenting their collection rates, and the existence of proprietary "secret sauce" methods that achieved those incredible results as facts—facts which they alone had the access to know whether they were true or false.

183.    The Count Two Defendants violated, and unless restrained and enjoined will in the future violate, Section 33-B of the Texas Securities Act.

THIRD CLAIM FOR RELIEF
**Fraud in Connection with the Purchase or Sale of Securities in
Violation of Section 33-F of the Texas Securities Act
(against Villarreal and Casarez)**

184.    Plaintiffs incorporate the allegations in paragraphs 1 – 183 as if fully set forth herein.

185.    This Count is against Defendants Villarreal and Casarez (the "Count Three Defendants").

186.    In the Spring 2014, at the Baylor Scott & White Medical Center–Carrolton, Defendant Anthony Casarez pitched Dr. Masel on the opportunity to start an IOM business.

187.    When Dr. Masel expressed interest in response to the pitch, Mr. Casarez arranged for Dr. Masel to meet with him his business partner Defendant Adrianna Villarreal.

188.    The three them met in May 2017 at the Corner Bakery at 2401 Preston Road in Plano to discuss the IOM opportunity.

189.    During this meeting Ms. Villareal bragged to Dr. Masel about MPS's ability to recover claims from insurance companies at a higher rate than other billing company based on her secret algorithm.

190.    She told Dr. Masel that MPS averaged $20,000 in payments per procedure for the technical component.

191.    Ms. Villarreal said that her average payment per procedure including the professional component was around $50,000-$75,000, a claim she repeated often thereafter to justify MPS's existence.

192.   Ms. Villarreal also told Dr. Masel that the reimbursement cycle for out-of-network claims is around six months.

193.   Indeed, on November 26, 2014, Ms. Villarreal bragged that MPS's "average out of network claim will reimburse around 50-75k."

194.   And on February 27, 2015, Ms. Villarreal copied Dr. Masel on an email where she claimed that the "[r]eimbursment cycle takes about 6 months for negotiations as all entities are billed out of network[.]"

195.   On March 31, 2015, Dr. Masel emailed Ms. Villarreal and asked, "What % of that A/R do you expect we collect?" Ms. Villarreal responded, "I always say 50% but a lot of times its more 😊"

196.   In reliance on Ms. Villarreal's and Mr. Casarez's representations, Plaintiffs Dr. Dr. Masel and Mr. Chandiramani formed the various Neuron Shield entities, entered into a business management and profits interest agreements with Defendants, and sold a 35% security interest in those entities to Defendants IOS Management Services and CGR Investments.

197.   As it turned out, the representations made by Defendants were false.

198.   MPS has not collected $50,000-$75,000 per procedure, and upon information and belief, never did.

199.   MPS has never collected 50% of the AR as promised and represented.

200.   Further, as stated by Ms. Villarreal in sworn Courtroom testimony, it takes MPS "anywhere from 12 to 18 months" to get a claim paid, instead of the 6 months she previously represented.

201.    In truth Villarreal had no "secret sauce" that would produce $50,000-$75,000 per procedure, yield 50% collections on accounts receivable, or result in a 6-month reimbursement cycle.

202.    CGR and IOS's interests in Neuron Shield were predicated on Villareal's misrepresentations being true; now that it is obvious that they were false, the sales of the securities were part of a scheme or artifice to defraud.

203.    The Count 3 Defendants knew these representations were untrue when they were made, but made them any to induce Plaintiffs to form the various Neuron Shield entities, entered into a business management and profits interest agreements, and sold a 35% security interest in those entities to Defendants IOS Management Services and CGR Investments.

204.    The Count 3 Defendants directly or indirectly controlled Defendants MPS, IOS Management Services, and CGR Investments, who offered to buy and bought a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

205.    Defendants knew that their representations were false because they were representing historical facts about their collection percentages, and presenting their collection rates, and the existence of proprietary "secret sauce" methods that achieved those incredible results as facts –facts which they alone had the access to know whether they were true or false.

206.    The Count 3 Defendants violated, and unless restrained and enjoined will in the future violate, Section 33-B of the Texas Securities Act.

**FOURTH CLAIM FOR RELIEF**
**Common Law Fraud and Fraudulent Inducement**
**(against Villarreal, Casarez, MPS, IOS Management, and CGR Investments)**

207.    Plaintiffs incorporate the allegations in paragraphs 1 – 206 as if fully set forth herein.

208.    This Count is against Defendants Villarreal, Casarez, MPS, IOS Management, and CGR Investments (the "Count Four Defendants").

209.    In the Spring 2014, at the Baylor Scott & White Medical Center–Carrolton, Defendant Anthony Casarez pitched Dr. Masel on the opportunity to start an IOM business.

210.    When Dr. Masel expressed interest in response to the pitch, Mr. Casarez arranged for Dr. Masel to meet with him his business partner Defendant Adrianna Villarreal.

211.    The three them met in May 2017 at the Corner Bakery at 2401 Preston Road in Plano to discuss the IOM opportunity.

212.    During this meeting Ms. Villareal bragged to Dr. Masel about MPS's ability to recover claims from insurance companies at a higher rate than other billing company based on her secret algorithm.

213.    She told Dr. Masel that MPS averaged $20,000 in payments per procedure for the technical component.

214.    Ms. Villarreal said that her average payment per procedure including the professional component was around $50,000-$75,000, a claim she repeated often thereafter to justify MPS's existence.

215.    Ms. Villarreal also told Dr. Masel that the reimbursement cycle for out-of-network claims is around six months.

216.    Indeed, on November 26, 2014, Ms. Villarreal bragged that MPS's "average out of network claim will reimburse around 50-75k."

217.    And on February 27, 2015, Ms. Villarreal copied Dr. Masel on an email where she claimed that the "[r]eimbursment cycle takes about 6 months for negotiations as all entities are billed out of network[.]"

218.    On March 31, 2015, Dr. Masel emailed Ms. Villarreal and asked, "What % of that A/R do you expect we collect?" Ms. Villarreal responded, "I always say 50% but a lot of times its more 😊"

219.    In reliance on Ms. Villarreal's and Mr. Casarez's representations, Plaintiffs Dr. Dr. Masel and Mr. Chandiramani formed the various Neuron Shield entities, entered into a business management and profits interest agreements with Defendants, and sold a 35% security interest in those entities to Defendants IOS Management Services and CGR Investments.

220.    As it turned out, the representations made by Defendants were false.

221.    MPS has not collected $50,000-$75,000 per procedure, and upon information and belief, never did.

222.    MPS has never collected 50% of the AR as promised and represented.

223.    Further, as stated by Ms. Villarreal in sworn Courtroom testimony, it takes MPS "anywhere from 12 to 18 months" to get a claim paid, instead of the 6 months she previously represented.

224.    In truth Villarreal had no "secret sauce" that would produce $50,000-$75,000 per procedure, yield 50% collections on accounts receivable, or result in a 6-month reimbursement cycle.

225.    CGR and IOS's interests in Neuron Shield were predicated on Villareal's misrepresentations being true; now that it is obvious that they were false, the sales of the securities were part of a scheme or artifice to defraud.

226.    The Count 4 Defendants knew these representations were untrue when they were made, but made them any to induce Plaintiffs to form the various Neuron Shield entities, entered into a business management and profits interest agreements, and sold a 35% security interest in those entities to Defendants IOS Management Services and CGR Investments.

227.    The Count Four Defendants made material misrepresentations regarding the amount of money MPS could collect per IOM procedure and the amount of time it would take to complete collections. The Count Four Defendants knew these statements were false at the time they were made. The Count Four Defendants made these statements with the intent that Dr. Masel and Mr. Chandiramani would agree to sell security interests in the Neuron Shield to the Defendants and cause the Neuron Shield entities to hire MPS to provide billing services. Plaintiffs relied on these representation to their detriment, which has damaged Plaintiffs.

228.   Had Plaintiffs been aware of the truth, they would not have sold a 35% security interest to Defendants or hired MPS to provide collections services.

229.   Defendants knew that their representations were false because they were representing historical facts about their collection percentages, and presenting their collection rates, and the existence of proprietary "secret sauce" methods that achieved those incredible results as facts—facts which they alone had the access to know whether they were true or false.

230.   At all times relevant to this cause of action, Plaintiffs were aware and believed that Villarreal and Cazares were representatives of and thus agents of MPS, CGR, and/or IOS.

**FIFTH CLAIM FOR RELIEF**
**Conduct and Participation in a RICO Enterprise through a**
**Pattern of Racketeering Activity**
**18 U.S.C. §§ 1961(5), 1962(c)**
**(against all Villarreal, Casarez, and USMON)**

231.   Plaintiffs incorporate the allegations in paragraphs 1 – 230 as if fully set forth herein.

232.   This Count is against Defendants Villarreal, Casarez, and USMON (the "Count V Defendants").

233.   Neuron Shield, MPS, IOS Management, CGR Management, Villarreal, Casarez, and USMON functioned as an enterprise (the "IOM Enterprise) with the lawful purpose of providing IOM services throughout the United States, including Louisiana, Texas, New Mexico, Arizona, and South Carolina.

234.    The IOM Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

235.    The Count V Defendants are employed by or associated with the IOM Enterprise.

236.    The Count V Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

237.    Specifically, Defendants via a pattern of fraudulent and racketeering activity utilized the IOM Enterprise to defraud Plaintiffs by continuing to represent (or omitting to correct) that that they could collect $50,000 to $75,000 for each out-of-network case, that the reimbursement cycle was only 6 months, and that Plaintiffs could expect to recover 50% of the accounts receivable.

238.    The IOM Enterprise caused the Neuron Shield entities to expend resources to provide IOM services on cases where Plaintiff's had no chance of recovering any money.

239.    The IOM Enterprise also used its fraudulent and deceptive scheme to obtain Plaintiffs' trade secret financial and business information, including customer identities and partnership relationships.

240.    The IOM Enterprise have also caused extreme financial harm to Neuron Shield by denying Neuron Shield access to its patients' claims data, which contributed to Neuron Shield ceasing operations.

241.    Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed multiple related acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C.

§ 1343) associated with the transmission and receipt of insurance communications, claims, and payments on behalf of Neuron Shield by mail and through the internet.

242.    On a nearly monthly basis between July 2014 and April 2016, Defendants sent or received correspondence to insurance companies for claims, and occasionally received payments from insurers for the IOM services they were billing for. These were all transmitted either through the interstate wires (email, internet based communications, or bank wire or ACH transfers), or through the U.S. Mails.

243.    Plaintiffs' misrepresentations were also sent through the interstate wires via email. For example, on a November 26, 2014 email from Villarreal she represented to Plaintiffs that she could collect $50,000 to $75,000 per case. On February 27, 2015, Ms. Villarreal copied Dr. Masel on an email where she claimed that the "[r]eimbursment cycle takes about 6 months for negotiations as all entities are billed out of network[.]" On March 31, 2015, Dr. Masel emailed Ms. Villarreal and asked, "What % of that A/R do you expect we collect?" Ms. Villarreal responded via email that, "I always say 50% but a lot of times its more ☺" Villareal's representations that the reimbursement was $75,000, that the reimbursement cycle only takes 6 months, and that she collects 50% of AR are all demonstrably false.

244.    The IOM Enterprise caused Plaintiffs to expend resources to provide IOM services on cases where Plaintiff's had no chance of recovering any money.

245.    The IOM Enterprise misappropriated Plaintiffs trade secrets by gaining access to confidential patient data and identities through deceitful means and by gaining

access to Plaintiffs' physician contacts through deceitful means in violation of 18 U.S.C. §
1832.

246.    Defendants MPS, Villarreal, and Casarez committed extortion by refusing to
allow Neuron Shield to access its patient billing records and its email server unless Neuron
Shield granted MPS a vested interest in Neuron Shield's accounts receivable.

247.    Defendants Villarreal, Casarez, MPS, and USMON violated the National
Stolen Property Act (18 U.S.C. § 2314) by transmitting or transferring Plaintiffs' patient
and claims data, the value of which is greater than $5,000 and which the Defendants knew
was converted, in interstate commerce.

248.    Defendants Villarreal and MPS committed wire fraud and financial
institution fraud (18 U.S.C. §§ 1344 & 1344) when they accessed Neuron Shield's bank
accounts on or about January 4, 2017, without permission and transferred approximately
$77,000 from Neuron Shield to MPS.

249.    The IOM Enterprise intended to commit the acts of mail fraud, wire fraud,
theft of trade secrets, extortion, and violations of the National Stolen Property Act set forth
above, which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

250.    The Count V Defendants have directly and indirectly conducted and
participated in the conduct of the IOM Enterprise's affairs through the pattern of
racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

251.    As a direct and proximate result of the IOM Enterprise's racketeering
activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their
business and property in that Neuron Shield has millions of dollars in uncollected and

potentially, and paid for and incurred costs associated with performing IOM procedures that will never be recover, forcing them to cease operations due to Defendants' violations of the RICO statute.

## SIXTH CLAIM FOR RELIEF
### Investment of Income Derived from a Pattern of Racketeering Activity
### 18 U.S.C. §§ 1961(5), 1962(a)
### (against all MPS, CGR Investments, and IOS Management)

252.    Plaintiffs incorporate the allegations in paragraphs 1 – 251 as if fully set forth herein.

253.    This Count is against Defendants MPS, CGR Investments, and IOS Management (the "Count VI Defendants").

254.    Neuron Shield, MPS, IOS Management, CGR Investments, Villarreal, Casarez, and USMON functioned as an enterprise (the "IOM Enterprise") with the lawful purpose of providing IOM services throughout the United States, including Louisiana, Texas, New Mexico, Arizona, and South Carolina.

255.    The IOM Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

256.    The IOM Enterprise caused Plaintiffs to expend resources to provide IOM services on cases where Plaintiff's had no chance of recovering any money.

257.    The IOM Enterprise also used its fraudulent and deceptive scheme to obtain Plaintiffs' trade secret financial and business information, including customer identities and partnership relationships. The IOM Enterprise have also caused extreme financial harm

to Neuron Shield by denying Neuron Shield access to its patients' claims data, which contributed to Neuron Shield ceasing operations.

258. Pursuant to and in furtherance of their fraudulent scheme, the members of the IOM Enterprise committed multiple related acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) associated with the transmission and receipt of insurance communications, claims, and payments on behalf of Neuron Shield by mail and through the internet.

259. The IOM Enterprise misappropriated Plaintiffs trade secrets by gaining access to confidential patient data and identities through deceitful means and by gaining access to Plaintiffs' physician and CNIM contacts through deceitful means in violation of 18 U.S.C. § 1832.

260. IOM Enterprise participants MPS, Villarreal, and Casarez committed extortion by refusing to allow Neuron Shield to access its patient billing records and its email server unless Neuron Shield granted MPS a vested interest in Neuron Shield's accounts receivable.

261. IOM Enterprise participants Villarreal, Casarez, MPS, and USMON violated the National Stolen Property Act (18 U.S.C. § 2314) by transmitting or transferring Plaintiffs' patient and claims data, the value of which is greater than $5,000 and which the Defendants knew was converted, in interstate commerce.

262. IOM Enterprise participants Villarreal and MPS committed wire fraud and financial institution fraud (18 U.S.C. §§ 1344 & 1344) when they accessed Neuron Shield's

bank accounts on or about January 4, 2017, without permission and transferred approximately $77,000 from Neuron Shield to MPS.

263.   The Count VI Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.

264.   The IOM Enterprise intended to commit the acts of mail fraud, wire fraud, theft of trade secrets, extortion, and violations of the National Stolen Property Act set forth above, which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

265.   As a direct and proximate result of the IOM Enterprise's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that Neuron Shield has millions of dollars in uncollected and potentially, and paid for and incurred costs associated with performing IOM procedures that will never be recover, forcing them to cease operations due to Defendants' violations of the RICO statute

### SEVENTH CLAIM FOR RELIEF
### Conspiracy to Engage in a Pattern of Racketeering Activity
### 18 U.S.C. §§ 1961(5), 1962(d)
### (against all Defendants)

266.   Plaintiffs incorporate the allegations in paragraphs 1 - 265 as if fully set forth herein.

267.   This Count is against all Defendants.

268.   Neuron Shield, MPS, IOS Management, CGR Investments, Villarreal, Casarez, and USMON functioned as an enterprise (the "IOM Enterprise") with the lawful

purpose of providing IOM services throughout the United States, including Louisiana, Texas, New Mexico, Arizona, and South Carolina.

269.    As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. §§ 1962 (a) & (c).

270.    The Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the IOM Enterprise through a pattern of racketeering activity. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c), in violation of 18 U.S.C. § 1962(d).

271.    As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that Neuron Shield has millions of dollars in uncollected and potentially, and paid for and incurred costs associated with performing IOM procedures that will never be recover, forcing them out of business due to Defendants' violations of the RICO statute

**EIGHTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(against Villarreal, Casarez, CGR Investments, IOS Management and USMON)**

272.    Plaintiffs incorporate the allegations in paragraphs 1 – 271 as if fully set forth herein.

273.    This Count is against Defendants Villarreal, Casarez, USMON, CGR Investments, and IOS Management (the "Count Eight Defendants").

274.   Defendants CGR Investments and IOS Management Services exercised control over Neuron Shield's operating affairs pursuant to a contractual arrangement that made these two parties agents and responsible fiduciaries of Neuron Shield.

275.   Defendants CGR Investments and IOS Management Services owe a fiduciary duty to Neuron Shield and to Plaintiffs Masel and Chandiramani as partners.

276.    Defendants CGR Investments and IOS Management Services are owned and controlled by Defendants Villarreal and Casarez.

277.   Defendants Adrianna Villarreal and Anthony Casarez were also officers of Neuron Shield and owed Neuron Shield fiduciary duties in that capacity.

278.   USMON was not a fiduciary of Neuron Shield directly, but was trustee of Neuron Shield's patient and billing information, and materially assisted the other defendants in the breaches of their fiduciary duties.

279.   The Count Eight Defendants breached their fiduciary duties to Neuron Shield by, among other things, (1) ceasing billing and collections actions in an attempt to extort more favorable contractual terms from the Plaintiffs; (2) denying and blocking Neuron Shield from accessing patient billing and claims data; (3) soliciting Neuron Shield's physician customers to provide IOM referrals to other entities in which the Count Eight Defendants had a financial interest; (4) recruiting CNIM's who worked for Neuron Shield to work for other entities in which Defendants' had a financial interest;  (5) utilizing leased monitoring equipment that was guaranteed by Neuron Shield in procedures performed by other entities in which Defendants' had a financial interest;  (6) denying Neuron Shield the ability to access its email server; (7) transferring money from Plaintiffs' bank account to

MPS's account without permission; and (8) in the case of USMON, materially conspiring with and assisting the other Count Eight Defendants in breaching their fiduciary duties.

280.    Plaintiffs were injured as a result of the Count Eight Defendants' breaches of fiduciary because millions of dollars of accounts receivable remain uncollected and uncollectable and because the breaches caused Neuron Shield to go out of business.

### NINTH CLAIM FOR RELIEF
### Breach of Contract
### (against MPS, IOS Management & CGR Investments)

281.    Plaintiffs incorporate the allegations in paragraphs 1 – 280 as if fully set forth herein.

282.    This Count is against MPS, IOS Management, and CGR Investments (the "Count Nine Defendants").

283.    Plaintiffs would show that, at all material times, there was an offer, an acceptance, consideration, mutual assent, capable parties, and a bargained for exchange that created a binding agreement between Plaintiffs on the one hand and Count Nine Defendants on the other. Plaintiffs and Count Nine Defendants had valid and enforceable contracts, Plaintiffs performed on those Contracts and, upon information and belief, Plaintiffs have not been paid sums for patient services rendered, and for which Plaintiffs are entitled to be paid.

284.    Pursuant to the billing Contract, MPS was charged with obligation of billing for Plaintiffs' patient services rendered, collecting unpaid accounts, and appealing Payors' denials of any claims. MPS failed to pursue and timely file claims pursuant to the Contract with Plaintiffs and/or Payor requirements.

285.    Upon information and belief, because of MPS's breaches of the Contracts, late Claims are now barred by Payor.

286.    Upon further information and belief, MPS failed to distribute Payor funds paid to Plaintiffs. The Count Nine Defendants' breaches of the billing Contract are a direct and proximate cause of Plaintiffs' damages upon which they now sue.

### TENTH CLAIM FOR RELIEF
### Tortious Interference with Contracts/Business Relationships
### (against all Defendants)

287.    Plaintiffs incorporate the allegations in paragraphs 1 – 286 as if fully set forth herein.

288.    Defendants CGR Investments and IOS Management Services are limited partners in the Neuron Shield entities.

289.    Defendants CGR Investments and IOS Management Services exercised control over Neuron Shield's operating affairs.

290.    Defendants CGR Investments and IOS Management Services owe a fiduciary duty to Neuron Shield and to Plaintiffs Masel and Chandiramani as partners.

291.     Defendants CGR Investments and IOS Management Services are owned and controlled by Defendants Villarreal and Casarez.

292.    Defendants Adrianna Villarreal and Anthony Casarez were officers of Neuron Shield and owed Neuron Shield a fiduciary duty.

293.    Plaintiffs have entered into various contracts with their patients to provide them with IOM services while undergoing surgical procedures.

294.    By refusing to return Plaintiffs' confidential information detailed above, *i.e.*, their electronic database files containing all of their billing and patient information, Defendants have willfully and intentionally interfered with Plaintiffs' contracts and business relationships with their patients and with their prospective economic advantage with those patients' insurers.

295.    Plaintiffs have also entered into contracts with surgeons and CNIMs regarding the provision of IOM services.

296.    Defendants have willfully and intentionally interfered with Plaintiff's contracts and business relationships with their business partners by spreading false information about Plaintiffs, for example, by falsely accusing Dr. Masel of fraud and by claiming Innovations Monitoring was part of Neuron Shield.

297.    Neuron Shield also entered in to a contract with U.S. Monitoring, Inc. for the provision of IOM billing technology and data storage.

298.    Defendants have willfully and intentionally interfered with Plaintiff's contracts and business relationships by threatening to bring a lawsuit against or withdraw business from U.S. Monitoring, Inc. if they release Neuron Shield's data to Neuron Shield.

299.    Defendants' intentional tortious interference with Plaintiffs' contracts and business relationships is a direct and proximate cause of Plaintiffs' damages upon which they now sue.

### ELEVENTH CLAIM FOR RELIEF
### Breach of Contract
### (against USMON)

300.    Plaintiffs incorporate the allegations in paragraphs 1 – 299 as if fully set forth herein.

301.    At all material times, there was an offer, an acceptance, consideration, mutual assent, capable parties, and a bargained for exchange that created a binding agreement between Neuron Shield on the one hand and USMON on the other.

302.    Plaintiffs and Defendants had valid and enforceable contract, Neuron Shield performed on that contract and USMON breached the contract by refusing provide Neuron Shield with a copy of its data on request.

303.    USMON's breach of its contract with Neuron Shield is a direct and proximate cause of Plaintiffs' damages upon which they now sue.

### TWELFTH CLAIM FOR RELIEF
### Conversion
### (against Villarreal, Casarez, MPS, and USMON)

304.    Plaintiffs incorporate the allegations in paragraphs 1 - 303 as if fully set forth herein.

305.    This Count is against Defendants Villareal, Casarez, MPS, and USMON (the "Count Twelve Defendants").

306.    Plaintiffs owned the Neuron Shield patient and claims data, and the @neuronshiled.com email domain (collectively, the "Property").

307.    The Count Twelve Defendants wrongly exercised dominion or control over the Property to the exclusion of and inconsistent with Plaintiffs' rights.

308.    The Plaintiff demanded return of the Property, and the Defendants have failed to return it.

309.    The Defendants conversion of the Plaintiffs' Property is a direct and proximate cause of Plaintiffs' damages upon which they now sue.

### THIRTEENTH CLAIM FOR RELIEF
**Temporary and Permanent Injunction and Request for Declaratory Relief
(against all Defendants)**

310.    Plaintiffs incorporate the allegations in paragraphs 1 - 309 as if fully set forth herein.

311.    Plaintiffs seeks a temporary and permanent injunction to: (i) order Defendants to turn over the Neuron Shield data in the USMON database to Plaintiffs; (ii) order Defendants to provide the Plaintiffs' with the administrative login credentials for the @neuronshield.com email server; and (iii) order Defendants to cease and desist from destroying any information related to Plaintiffs and the claims made in these counterclaims. Unless Defendants are enjoined from destroying the information and ordered to turn the information over, Plaintiffs will suffer and will continue to suffer clear, immediate, direct, and irreparable injury by Defendants' continued attempts to unreasonably interfere with Plaintiffs' livelihood.

312.    Plaintiffs are the proper owners of the requested Documents and Information from Defendants and are unable to transfer their accounts to a new billing company without the information, interfering with their ability to earn a living because they would not be able to recover for the patient services and surgeries provided.

313.    Pursuant to HIPPA and the contracts between the Plaintiffs and pertinent Defendants, Plaintiffs own and have the right to the Information & Documentation and a right to keep that Information and Documentation.

314.    Under 28 U.S.C. § 2201, Federal Rule of Civil Procedure 57, and Chapter 37 of the Texas Civil Practice & Remedies Code, Plaintiffs seek a declaratory judgment that Plaintiffs own and have a right to the Information and Documentation and have a right to it, and that Defendants, including MPS, have no right to it.

315.    The information in the USMON database and on the @neuronshield.com email server is critical to Neuron Shield's business and its continued operations. Most of this information belongs to Plaintiffs—not Defendants—and Plaintiffs will be irreparably harmed if this information is not provided on an expedited basis because:

(1) Neuron Shield's information (that is wrongfully in Defendants' custody) is time-sensitive and it is needed for Plaintiffs to make/process claims and be paid for their patient provided services (including meeting payor specific deadlines, which are currently unknown);

(2) Plaintiffs need to determine, examine and evaluate Neuron Shield's financial status based upon the accounts receivables outstanding vis a vis all payments that have already been received, yet undistributed;

(3) Plaintiffs have ethical and statutory obligations to maintain the confidentiality, integrity and protection of Neuron Shield's patients' protected health information; and

(4) Plaintiffs must be able to continue and sustain its operations so that they can continue to be a going concern and a profitable business.

316.    Plaintiffs have suffered and will continue to suffer irreparable harm from the conduct of Defendants. The harm and loss will continue unless this Court restrains and ultimately enjoins the conduct of Defendants. Plaintiffs are therefore entitled to temporary and permanent injunctive relief as requested above.

## V.

## REQUESTED RELIEF

317.    Plaintiffs request the Court to award their actual damages in an amount to be proven at trial, including interest. Plaintiff requests that any amounts of actual damages awarded under their RICO claims be trebled.

318.    Plaintiffs request the Court to award punitive damages, to the extent permitted by law, in an amount to be proven at trial.

319.    Plaintiff request the Court to award Plaintiffs their reasonable costs and attorneys' fees.

320.    Plaintiffs request the Court to award such equitable, injunctive, or other relief as the Court may deem just and proper.

## VI.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: August 1, 2017                      Respectfully submitted,


                                           */s/  Mazin A. Sbaiti*
                                           **Mazin A. Sbaiti**
                                           Texas Bar No. 24058096
                                           MAS@sbaitilaw.com
                                           **Ronald W. Burns**
                                           Texas Bar No. 24031903
                                           RWB@sbaitilaw.com
                                           **SBAITI & COMPANY PLLC**
                                           Dallas Renaissance Tower
                                           1201 Elm Street – Suite 4010
                                           Dallas, TX  75270
                                           T:  (214) 432-2899
                                           F:  (214) 853-4367

                                           **Counsel for Plaintiffs**

---