# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| DR. DAVID MASEL, DINESH CHANDIRAMANI, NEURON SHIELD, LLC, NEURON SHIELD PARTNERS I, LP, NEURON SHIELD 2, LLC, NEURON SHIELD PARTNERS 2, LP, NEURON SHIELD 3, LLC, NEURON SHIELD PARTNERS 3, LP, NEURON SHIELD 4, LLC, NEURON SHIELD PARTNERS 4, LP, NEURON SHIELD 7, LLC, NEURON SHIELD MONITORING ASSOCIATES, PLLC, NEURON INTEGRITY TEXAS, PLLC, NEURON INTEGRITY 1, PLLC, NEURON INTEGRITY PARTNERS, LLC, NEURON SHIELD MONITORING ASSOCIATES PC, and NEURON SHIELD 9, LLC | § § § § § § § § § § § § § § § § § § § | Civil Action No. 4:17-CV-00533<br>Judge Mazzant |
| v. | § § § § | |
| ADRIANA VILLARREAL, ANTHONY CASAREZ, MEDICAL PRACTICE SOLUTIONS, LLC, IOS MANAGEMENT SERVICES, LLC, CGR INVESTMENTS, LLC, and U.S. MONITORING, INC. | § § § § § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants Adriana Villarreal, Anthony Casarez, Medical Practice Solutions, LLC, IOS Management Services, LLC, and CGR Investments, LLC's Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to Federal Rules 12(b)(6), 9(b), and 12(b)(1) (Dkt. #65). After reviewing the relevant pleadings and motion, the Court finds that the motion should be granted.

# BACKGROUND

Plaintiff David Masel, M.D. ("Masel") is a neurosurgeon licensed to practice in Texas with thirty-two years of experience. In the Spring of 2014, Masel met with Defendants Anthony Casarez ("Casarez") and Adrianna Villarreal ("Villarreal") to discuss the possibility of forming entities to provide intraoperative neurophysiological monitoring ("IOM")[1] services. During the course of their meeting, Masel alleges Villarreal made several misrepresentations regarding, among other things, the profitability of a potential IOM entity.[2] Masel avers that he relied on such representations and conveyed them to his business partner, Plaintiff Dinesh Chandiramani ("Chandiramani"). Based on said statements, Masel alleges he and Chandiramani created each of the Plaintiff entities.

Masel and Chandiramani (collectively, "Plaintiffs") initially created Neuron Shield, LLC, exclusively for the purpose of providing IOM services throughout the United States. Neuron Shield, LLC, later contracted with Defendant Medical Practice Solutions, LLC ("MPS"), to provide billing services. Neuron Shield, LLC, also contracted with CGR Investments, LLC ("CGR Investments"), and later Defendant IOS Management Services, LLC ("IOS Management"), to be the manager of the business and oversee operations.

Over time, Plaintiffs created various entities to provide IOM services (collectively "Neuron Shield").[3] Plaintiffs allege the creation of these entities resulted from relying on the material misrepresentations and omissions of Defendants Villarreal, Casarez, MPS, CGR Investments, and

---

[1] IOM involves the use of various neurological monitoring techniques to monitor a patient's nervous system during surgery. The primary purpose of IOM is to reduce the risk of surgical damage to the nervous system by providing early warnings of potential injury to the nervous system.

[2] Plaintiffs contend that Cazares agreed with and confirmed the veracity of Villarreal's statements for Masel, thus adopting them as his own representations.

[3] Neuron Shield Partners 1, LP; Neuron Shield 2, LLC; Neuron Shield Partners 2, LP; Neuron Shield 3, LLC; Neuron Shield Partners 3, LP; Neuron Shield 4, LLC; Neuron Shield Partners 4, LP; Neuron Shield 7, LLC; Neuron Shield Monitoring Associates, PLLC; Neuron Integrity Texas, PLLC; Neuron Integrity 1, PLLC; Neuron Integrity Partners, LLC; Neuron Shield Monitoring Associates PC; and Neuron Shield 9, LLC.

IOS Management (collectively "Defendants").[4]  Plaintiffs later contracted with Defendants through a series of management services, profits interest, and limited partnership agreements to manage Neuron Shield's responsibilities and business.  Under these agreements, CGR Investments and IOM Management functioned as the sole and exclusive manager providing management, administrative, and other related services to Neuron Shield.  Together Neuron Shield, MPS, IOS Management, and CGR Investments functioned as an alleged enterprise ("IOM Enterprise") for the purpose of providing IOM services throughout the United States.[5]

Over the course of two and a half years, certain events occurred that caused the relationship between Plaintiffs and Defendants to deteriorate.  Specifically, Plaintiffs claim that Defendants set up new parallel businesses, steered away business, stole Plaintiffs' business opportunities, misused the financial arrangements that Plaintiffs entrusted Defendants with, and failed to perform the billing services for which they were hired.  As the result of the alleged misrepresentations and aforementioned acts and omissions, Plaintiffs filed suit against Defendants alleging violations of the federal anti-racketeering statutes ("RICO"), the Texas Securities Act, and the Texas Theft Liability Act.  Further, Plaintiffs brought claims for securities fraud, fraud, fraudulent inducement, breach of fiduciary duty, breach of contract, tortious interference with contracts, and negligence.

On October 20, 2017, Plaintiffs filed their First Amended Complaint (Dkt. #49).  On November 17, 2017, Defendants filed their Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to Rules 12(b)(6), 9(b), and 12(b)(1) (Dkt. #65).  On December 22, 2017, Plaintiffs filed their response (Dkt. #72), and on January 19, 2018, Defendants filed their reply (Dkt. #75).

---

[4] Villarreal and Casarez control and manage MPS, CGR Investments, and IOM Management.
[5] As part of the transaction, Masel and Chandiramani sold to IOS Management and CGR Investments 35% interests in certain Plaintiff Entities.

**LEGAL STANDARD**

**I.      Rule 12(b)(6)**

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012).  The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).  The Court must then determine whether the complaint states a claim for relief that is plausible on its face.  "'A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion.  First, the Court should identify and

4

disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing [C]ourt to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## II.    Rule 9(b)

Rule 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002). The goals of Rule 9(b) are to "provide[] defendants with fair notice of the plaintiffs' claims, protect[] defendants from harm to their reputation and goodwill, reduce[] the number of strike suits, and prevent[] plaintiffs from filing baseless claims." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)

(citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)). Courts are to read Rule 9(b)'s heightened pleading requirement in conjunction with Rule 8(a)'s insistence on simple, concise, and direct allegations. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). However, this requirement "does not 'reflect a subscription to fact pleading.'" *Grubbs*, 565 F.3d at 186. "Claims alleging violations of the Texas Insurance Code and the DTPA and those asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to the requirements of Rule 9(b)." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998); *see Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2010 WL 3422873, at *14 (N.D. Tex. Aug. 26, 2010) ("'[W]hen the parties have not urged a separate focus on the negligent misrepresentation claims,' the Fifth Circuit has found negligent misrepresentation claims subject to Rule 9(b) in the same manner as fraud claims."). Failure to comply with Rule 9(b)'s requirements authorizes the Court to dismiss the pleadings as it would for failure to state a claim under Rule 12(b)(6). *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B, 2014 WL 3353247, at *3 (N.D. Tex. July 9, 2014) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)).

## III.     Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

## ANALYSIS

Defendants argue dismissing Plaintiffs' claims is warranted pursuant to Rules 12(b)(6), 9(b), and 12(b)(1). Rule 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction. If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court considers the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming*, 281 F.3d at 161.

Defendants aver that the only basis for "this Court's jurisdiction hinges upon [Plaintiffs'] Federal claims, which . . . should be dismissed." (Dkt. #65 at p. 44). After dismissing Plaintiffs' federal claims, Defendants contend the Court, in its discretion, should "decline to exercise supplemental jurisdiction over any of Plaintiffs' remaining Texas law state law claims, to the extent they have been adequately pleaded." (Dkt. #65 at pp. 44–45). In other words, Defendants

argue that should the Court dismiss Plaintiffs' federal claims, the Court should then decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. As such, although a court generally addresses a 12(b)(1) claim first, because Defendants' 12(b)(1) argument is contingent upon their 12(b)(6) and 9(b) arguments—whether Plaintiffs properly pleaded their federal claims—the Court first addresses Defendants' 12(b)(6) and 9(b) arguments followed by 12(b)(1).

**I. Rule 12(b)(6) and 9(b)**

    **a. Count 1**

Plaintiffs' first claim ("Count 1") asserts a cause of action under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5. Section 10(b) makes it unlawful for any person

> [t]o use or employ in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The SEC rule promulgated under § 10(b)—Rule 10b–5—makes its unlawful for any person, directly or indirectly

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of a security.

17 C.F.R. § 240.10b–5.

> To succeed on a claim under Section 10(b), a plaintiff must prove:
>
> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Affco Invs. 2001, LLC v. Proskauer Rose, LLP*, 625 F.3d 185, 192 (5th Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Sci.–Atl., Inc.*, 552 U.S. 148, 157 (2008)).

Defendants put forth five separate arguments demonstrating why dismissing Count 1 is warranted.  The Court finds it is only necessary to address whether Plaintiffs amended complaint satisfied the heightened pleading standards.

### i. Does Plaintiffs' Amended Complaint Satisfy the Heightened Pleading Standards?

Defendants aver that Plaintiffs fail to satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Plaintiffs respond that they sufficiently pleaded the misstatements and omissions of material fact.

"On a motion to dismiss a federal securities fraud case for failure to state a claim, the Court must apply the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *McNamara v. Bre–X Minerals Ltd.*, 57 F. Supp. 2d 396, 403 (E.D. Tex. 1999) (citing *Williams*, 112 F.3d at 177).  Courts agree that when Congress implemented the PSLRA it intended that the act "heighten the pleading requirements in securities fraud cases above the requirements of case law interpreting Rule 9(b)." *Id.* at 405.  As such, "the PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading"—the particularity requirement. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 240 (5th Cir. 2009) (citing 15 U.S.C. § 78u–4(b)(1)).  Additionally, the PSLRA "provides that a plaintiff must allege facts 'giving rise to a strong inference that the defendant acted with the required state of mind'"—the scienter requirement. *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)).

Keeping these requirements in mind, the Court addresses the alleged misrepresentations made by Villarreal followed by those allegedly made by the remaining Defendants. Further, the Court analyzes the alleged omissions by Defendants.

### 1. Villarreal's Alleged Misrepresentations[6]

Plaintiffs contend that Villarreal violated the securities laws through her misrepresentations. Specifically, Plaintiffs point to the following statements:

(1) "During this meeting Ms. Villar[r]eal represented to Dr. Masel that her billing company MPS was superior at billing IOM procedures and could generate the highest payouts." (Dkt. #49 at ¶ 44).

(2) "While working at these insurance companies, Villarreal claimed that she developed unique insight and expertise that allowed her to develop an algorithm that enabled her to pinpoint how much any given claim will pay within a 10 to 20 percent margin of error—what she termed her 'secret sauce.'" (Dkt. #49 at ¶ 46).

(3) "At the meeting, Villarreal represented to Dr. Masel that because of her secret sauce, she had the ability to generate $50,000 or more for each out-of-network IOM claim. She told Dr. Masel that she could generate $20,000 in additional revenue for the technical component of monitoring, and that she typically got much more, up to $50,000 for the professional component." (Dkt. #49 at ¶ 47).

(4) "Ms. Villarreal also told Dr. Masel that MPS's reimbursement cycle for out-of-network claims is around six months." (Dkt. #49 at ¶ 51).

(5) "Ms. Villarreal continually promised a significant return on Neuron Shield's efforts and investment. This was captured in a March 31, 2015 email where Dr. Masel asked Ms. Villarreal what percent of the account receivable could be expected for MPS to recover. Ms. Villarreal responded, 'I always say 50% but a lot of times it[']s more ☺.'" (Dkt. #49 at ¶¶ 89–90).

(6) "About a month earlier, on February 27, 2015, Ms. Villarreal had repeated to Dr. Masel her[] statement that the '[r]eimbursement cycle takes about 6 months[.]'" (Dkt. #49 at ¶ 91).

(7) "[O]n November 26, 2014, Ms. Villarreal bragged that MPS's 'average out of network claim will reimburse around 50-75k.'" (Dkt. #49 at ¶ 178).

---

[6] Plaintiffs allege that Villarreal, a 95% owner of MPS, spoke on behalf MPS. As such, the Court addresses Villarreal as well as MPS in this section of its analysis.

Although Plaintiffs accuse Villarreal of making the above mentioned misrepresentations, in many instances those allegations lack the required level of particularity. *See Herrmann*, 302 F.3d at 564–65 (a plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."). Specifically, Paragraphs 6 and 7 fail to specify the place Villarreal allegedly made such statements. As such, the only statements surviving the particularity requirements are Paragraphs 1 through 5. *See McNamara*, 57 F. Supp. 2d at 413.

Despite Paragraphs 1 through 5 surviving the particularity requirement, such statements are not actionable under 10b–5 for several reasons. Paragraph 1 is not actionable because it is puffery. *See Hall v. Rent-A-Center, Inc.*, No. 4:16-CV-978, 2017 WL 6398742, at *20 (E.D. Tex. Oct. 19, 2017), *report and recommendation adopted by*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) (statements that constitute optimistic generalizations or expressions of confidence in its management or business are not actionable) (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001)).[7] Paragraphs 2 and 4 fail because Plaintiffs omit any allegations demonstrating that such statements were false when they were made. Although Plaintiffs claim that the statements turned out to be untrue, that is insufficient to explain that the statements were fraudulent when made. *See Taha v. William Marsh Rice Univ.*, No. H–11–2060, 2012 WL 1576099, at *3 (S.D. Tex. May 3, 2012).

Paragraph 3 constitutes a future prediction, which generally is not actionable. *See id.* (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983)). However, "an expression of an

---

[7] *See also Carlton v. Cannon*, 184 F. Supp. 3d 428, 455 (S.D. Tex. 2016) ("Allegations that amount to little more than corporate 'cheerleading' are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts.") (citation omitted).

opinion as to the happening of a future event may . . . constitute fraud where the speaker purports to have special knowledge of facts that will occur or exist in the future." *Trenholm*, 646 S.W.2d at 930 (citations omitted). In Paragraph 3, Villarreal represented that based on her "secret sauce" she maintained the ability "to pinpoint how much any given claim will pay within a 10 to 20 percent margin of error." (Dkt. #49 at ¶ 47). As such, Villarreal purported "to have special knowledge" on claim payouts. Thus, it would seem that Paragraph 3 is an actionable statement; however, it is not. Plaintiffs fail to allege why such a statement was fraudulent when made. Instead, Plaintiffs only allege that the representations turned out to be untrue, which is insufficient. *See Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993) ("[s]tatements that are predictive in nature are actionable only if they were false when made"); *accord Isquith v. Middle S. Util., Inc.*, 847 F.2d 186, 203 (5th Cir. 1988) (liability under Rule 10b–5 depends on "whether the predictive statement was 'false' when it was made," not on whether the prediction is later proved as incorrect). As such, Paragraph 3 is not an actionable statement.

Paragraph 5, like Paragraph 3, is a future prediction because Villarreal is opining on the percent of accounts receivable Plaintiffs can expect. This statement does not fall within the exception explained above because Villarreal is not purporting "to have special knowledge of facts." *Trenholm*, 646 S.W.2d at 930. Even if Villarreal did represent to maintain such special knowledge, Plaintiffs fail to allege facts as to why the statement was false when it was made. As such, Paragraph 5 is not an actionable statement.

Assuming *arguendo* that Paragraphs 2 through 5 constitute actionable statements, such representations still fail because Plaintiffs do not sufficiently plead facts to satisfy the scienter requirement. As explained earlier, the PSLRA requires plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u–4(b)(2). "To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness." *Hall*, 2017 WL 6398742, at *26 (citing *Lormand*, 565 F.3d at 251). Severe recklessness is limited to those "highly unreasonable . . . misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (citation omitted). "Scienter must exist at the time the misrepresentation occurred." *Budde v. Global Power Equip. Grp., Inc.*, No. 3:15-CV-1679-M, 2017 WL 6621540, at *2 (N.D. Tex. Dec. 27, 2017).

"To qualify as 'strong,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non[-]fraudulent intent." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). While a plaintiff must plead "with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference," the pleading "'need not be irrefutable, i.e., of the smoking–gun genre, or even the most plausible of competing inferences.'" *Lormand*, 565 F.3d at 251 (quoting *Tellabs*, 551 U.S. at 321). In determining whether a plaintiff adequately pleads scienter, the Court "engage[s] in a comparative evaluation," weighing "not only inferences urged by [Plaintiffs] . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. "Conclusory allegations are not sufficient." *Budde*, 2017 WL 6621540, at *2 (citing *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 538–39 (5th Cir. 2008)). The Court must "assess all the allegations holistically," not each in isolation. *Tellabs*, 551 U.S. at 326.

In their Amended Complaint, Plaintiffs allege that "Defendants knew these representations were untrue when they were made, but made them anyway to induce Plaintiffs. . . ." (Dkt. #49 at ¶ 188). Further, Plaintiffs claim that "Defendants knew the statements were untrue" because

Defendants made such representations "based upon metrics and information" in their control, meaning that "Defendants knew or recklessly disregarded the falsity of their representations." (Dkt. #49 at ¶ 189). The Court finds that such allegations are conclusory and fail to provide "particular facts" creating "a strong inference that [Defendants] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see Ind. Elec. Workers' Pension Tr.*, 537 F.3d at 539 ("'[G]eneral allegations and conclusory statements, such as stating [defendants] knew . . . adverse material' cannot support a strong inference of scienter.") (quoting *Fin. Acquisition Partners v. Blackwell*, 440 F.3d 278 289–90 (5th Cir. 2006)).

Accordingly, because Plaintiffs fail to properly plead their 10(b) claim, the Court finds that Count 1 should be dismissed as it relates to Villarreal.[8]

## 2. Remaining Defendants' Alleged Misrepresentations

Plaintiffs allege Casarez, IOS Management, and CGR Investments made material misrepresentations in violation of § 10(b). The Court is unpersuaded.

Plaintiffs claim that in the Spring of 2014 at the Baylor Scott & White Medical Center in Carrolton, Texas, Casarez told Masel that "the IOM business was extremely profitable and that Dr. Masel could earn a substantial return on his time and money if he were to invest in an IOM company." (Dkt. #49 at ¶¶ 39–40). The Court finds such statement fails because it is puffery. *See Carlton*, 184 F. Supp. 3d at 455; *Hall*, 2017 WL 6398742, at *20. Further, Plaintiffs omit any support for why the statement is fraudulent or what Casarez obtained by making such a representation. *See Taha*, 2012 WL 1576099, at *3. As a result, Casarez's statement is not actionable.

---

[8] Because the Court finds that Plaintiffs failed to sufficiently plead a plausible 10(b) claim against Villarreal, the Court finds Plaintiffs' 10(b) claim also fails as it relates to MPS.

Further, Plaintiffs contend that Casarez "agreed with and confirmed the veracity of [Villarreal's] statements" thus, "adopting them as his own representations." (Dkt. #49 at ¶ 53). Assuming this is true, as explained above, such statements are not actionable. Consequently, because all of the statements allegedly made or adopted by Casarez are not actionable, Count 1, as it relates to Casarez, fails.

Plaintiffs allege that IOS Management and CGR Investments, through Villarreal and Casarez, made material misrepresentations. Because the Court finds that neither Villarreal nor Casarez made actionable misrepresentations, IOS Management and CGR Investments likewise cannot be said to have made any actionable misrepresentations.

### 3. Fraud by Omission

Plaintiffs further allege that Defendants failed to disclose material information resulting in violations of § 10(b). Specifically, Plaintiffs point to the following omissions:

(1) "During the discussions that led to the formation of Neuron Shield, Villarreal and Casarez failed to disclose to Masel and Chandiramani that MPS had vested financial interests in scores of other IOM providers that would be competing with Neuron Shield. . . . In fact, when Dr. Masel inquired about the potential conflicts of interest, Villarreal told him that MPS provided billing services to only one other IOM provider, which she described as 'small.' In a recent court hearing, however, Villarreal testified that MPS provided billing services to '109 or 110' IOM providers and stated that Neuron Shield as one of her 'smaller clients.'" (Dkt. #49 at ¶¶ 61, 63–64).

(2) "During the discussions Villarreal and Casarez failed to disclose to Masel and Chandiramani that they and MPS intended to set up competing businesses with other people and that they intended to redirect potential business away from Plaintiffs." (Dkt. #49 at ¶ 62).

(3) "The Defendants never disclosed to Plaintiffs that they would never receive any compensation on the majority of IOM cases they performed." (Dkt. #49 at ¶ 115).

"Fraud by omission (or fraud based on nondisclosure) occurs where there is a duty to disclose information as a matter of law." *Hoffman v. AmericaHomeKey, Inc.*, 23 F. Supp. 3d 734,

744 (N.D. Tex. 2014) (alteration in original) (citing *Smith v. BCE Inc.*, 225 F. App'x 212, 217–18

(5th Cir. 2007)). "To sustain a fraud by omission claim, the plaintiff must prove all the elements

of 'fraud by affirmative misrepresentation, including fraudulent intent, with the exception that the

misrepresentation element can be proven by [omission] of a material fact in light of a duty to

disclose.'" *Smith*, 225 F. App'x at 218 (quoting *United Teacher Assocs. Ins. Co. v. Union Labor*

*Life Ins. Co.*, 414 F.3d 558, 567 (5th Cir. 2005)). Thus, in order to maintain a claim for fraud by

omission, a plaintiff, as a threshold matter, must show that a party had a duty to disclose. Further,

such a showing must satisfy the heightened pleading standard of Rule 9(b). *Hoffman*, 23 F. Supp.

3d at 745. Whether such a duty exists depends on the circumstances. Courts have recognized a

duty arises

> (1) when there is a fiduciary relationship; (2) when one voluntarily discloses
> information, the whole truth must be disclosed; (3) when one makes a
> representation, new information must be disclosed when that new information
> makes the earlier representation misleading or untrue; and (4) when one makes a
> partial disclosure and conveys a false impression.

*Id.* (quoting *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.—Houston [14th Dist.] 1997, writ

denied)). Once a plaintiff establishes a duty to disclose exists, the plaintiff must further show that

the party with such duty

> (1) conceals or fails to disclose a material fact within the knowledge of that party;
> (2) knows the other party is ignorant of the fact and does not have an equal
> opportunity to discover the truth; (3) intends to induce the other party to take some
> action by concealing or failing to disclose the fact; and (4) the other party suffers
> injury as a result of acting without knowledge of the undisclosed fact.

*Id.* at 744–45 (citation omitted).

Plaintiffs argue a duty to disclose exists because Defendants failed to fully disclose

potential conflicts of interest with other IOM providers for which they supplied billing services.

In other words, Plaintiffs allege that Defendants made a partial disclosure as to the potential

conflicts of interests. Taking such allegations as true, the Court finds Plaintiffs sufficiently pleaded facts to establish a duty to disclose under such circumstances. *See* (Dkt. #49 at ¶¶ 61–64). Because the Court finds a duty to disclose exists, the Court next determines whether Plaintiffs' pleading satisfies the particularity and scienter requirements under Rule 9(b) and the PSLRA.

"Although the nature of an omission renders it more difficult to plead with particularity than an affirmative misrepresentation, Plaintiffs must still comply with Rule 9(b)." *Berry v. Indianapolis Life Ins. Co.*, 600 F. Supp. 2d 805, 821 (N.D. Tex. 2009). "Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006).

Regarding Paragraph 1, Plaintiffs allege that Defendants omitted the actual number of IOM providers MPS provided billing services to and that such information should have been disclosed when Masel "inquired about potential conflicts of interest." (Dkt. #49 at ¶¶ 63–64). Further, Plaintiffs claim such omission made Defendant's statement—that they only provided billing services to "one other IOM provider"—misleading because MPS actually "provided billing services to '109 or 110' IOM providers." (Dkt. #49 at ¶¶ 63–64). Accordingly, the Court finds Paragraph 1 satisfies the particularity requirement.

Regarding Paragraphs 2 and 3, such paragraphs fail to meet the particularity requirement. Specifically, Plaintiffs "fail to allege the circumstances that would necessitate making such disclosures, such as when and where these disclosures should have been made." *Hernandez v. Ciba–Geigy Corp. USA*, 200 F.R.D. 285, 291 (S.D. Tex. 2001); *accord Hoffman*, 23 F. Supp. 3d at 747. As such, Paragraphs 2 and 3 are insufficient to properly make out a claim for fraud by

omission.  *See id.*  However, because Paragraph 1 meets the particularity requirement, the Court

determines whether Plaintiffs' pleading satisfies the scienter requirement.

In order to satisfy the scienter requirement, Plaintiffs must "state with particularity facts

giving rise to a strong inference that the defendant acted with required state of mind."  15 U.S.C.

§ 78u–4(b)(2).  Thus, "[t]o establish scienter, a plaintiff must show the defendant intended to

deceive, defraud, or manipulate, or that the defendant acted with severe recklessness."  *Hall*, 2017

WL 6398742, at *26 (citing *Lormand*, 565 F.3d at 251).  "[T]he inference of scienter must be

'more than merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of non[-]fraudulent intent."  *Budde*, 2017 WL 6621540, at *2 (quoting *Tellabs*,

551 U.S. at 314).  As such, the Court "engage[s] in a comparative evaluation," weighing "not only

inference urged by [Plaintiffs] . . . but also competing inferences rationally drawn from the facts

alleged."  *Tellabs*, 551 U.S. at 314.  "Conclusory allegations are not sufficient."  *Budde*, 2017 WL

6621540, at *2 (citing *Ind. Elec. Workers' Pension Tr.*, 537 F.3d at 538–39).

In their Amended Complaint, Plaintiffs only make allegations that Defendants acted with

the requisite state of mind in making misrepresentations.  *See* (Dkt. #49 at ¶¶ 188–89) ("Defendants

knew these *representations* were untrue when they were made, but made them anyway to induce

Plaintiffs . . . "Defendants knew the statements were untrue" because Defendants made such

*representations* "based upon metrics and information" in their control, meaning that "Defendants

knew or recklessly disregarded the falsity of their *representations*."") (emphasis added).  However,

Plaintiffs fail to provide any factual support that Defendants made any alleged omissions with the

required mental state.[9]  As such, the Court finds Plaintiffs failed to provide "particular facts"

---

[9] Even if the Court took Plaintiff's allegations regarding Defendants' state of mind in making the alleged misrepresentations and applied them towards Defendants' alleged omissions, as explained earlier, such allegations fail to satisfy the scienter requirement.

creating "a strong inference that [Defendants] acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).

Accordingly, because Plaintiffs fail to properly plead the existence of actionable omissions, the Court finds that Count 1 should be dismissed.

### b.  Counts 5, 6, and 7

Plaintiffs' fifth, sixth, and seventh claims for relief assert causes of actions under RICO. Specifically, Plaintiff alleges violations of 18 U.S.C. §§ 1962(a), (c)–(d).

Common elements required to prove a violation of a subsection of § 1962 include: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct or control of an enterprise."  *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003) (citing *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988)).  Defendants aver that Plaintiffs failed to properly plead the existence of an enterprise, which warrants dismissing all of Plaintiffs' RICO claims—Counts 5 through 7. Conversely, Plaintiffs respond that they sufficiently pleaded the existence of an enterprise.

"A plaintiff asserting a civil RICO claim must allege the existence of such an enterprise." *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir. 1988) (citing *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 427 (5th Cir. 1987)).  "An enterprise is a group of persons or entities associating together for the common purpose of engaging in a course of conduct."  *Whelan*, 319 F.3d at 229 (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  "The enterprise may be a legal entity or 'any group of individuals *associated in fact* although not a legal entity.'"  *Id.* (emphasis in original) (quoting 18 U.S.C. § 1961(4)).

"An association-in-fact enterprise is simply a continuing unit that functions with a common purpose."  *Boyle v. United States*, 556 U.S. 938, 948 (2009).  It "'must have an ongoing

organization or be a continuing unit, such that the enterprise has an existence that can be defined apart from the commission of the predicate acts.'" *Zastrow v. Houst. Auto Imports Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015) (quoting *Montesano*, 818 F.2d at 427). Stated differently, "[t]he enterprise is not a pattern of racketeering activity, but must exist separate and apart from the pattern of racketeering activity in which it engages." *Whelan*, 319 F.3d at 229 (citing *Atkinson v. Anadarko Bank and Tr. Co.*, 808 F.2d 438, 441 (5th Cir. 1987)); *accord Manax*, 842 F.2d at 811. An association-in-fact enterprise, "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." *Boyle*, 556 U.S. at 948. "Members of the group need not have fixed roles; different members may perform different roles at different times." *Id.* The plaintiff "must plead specific facts, not mere conclusory allegations, which establishes the enterprise." *Montesano*, 818 F.2d at 427.

Plaintiffs claim they sufficiently pleaded the existence of two association-in-fact enterprises. First, the IOM Enterprise comprised of Neuron Shield, IOS Management, CGR Investments, and MPS. Plaintiffs contend the IOM Enterprise "'functioned as an enterprise . . . with the *lawful* purpose of providing IOM services throughout the United States.'" (Dkt. #72 at p. 28) (emphasis in original) (quoting Dkt. #49 at ¶ 276). Second, Plaintiffs claim that the other IOM businesses that Villarreal and Casarez allegedly invested in, operated, and controlled constitute an enterprise.

Defendants aver Plaintiffs' pleadings fail "[b]ecause the alleged [IOM E]nterprise is one created by the alleged racketeering activity itself." (Dkt. #65 a p. 35). In other words, the alleged IOM Enterprise does not exist separate and apart from the alleged pattern of racketeering. Further, Defendants contend that Plaintiffs amended complaint fails to support their assertion that they "pleaded an enterprise stemming from Villarreal, Casarez, and unidentified 'other IOM

businesses.'" (Dkt. #75 at p. 15 n.52) (quoting Dkt. #72 at p. 28). Finally, Defendants claim

Plaintiffs failed to plead the existence of any structural features required in a RICO enterprise.

As explained above, an association-in-fact enterprise must have "'an existence that can be

defined apart from the commission of predicate acts.'" *Zastrow*, 789 F.3d at 562 (quoting

*Montesano*, 818 F.2d at 427). Here, Plaintiffs assert they created Neuron Shield based on the

alleged misrepresentations by Villarreal and Casarez. Specifically, they allege the following:

> "The statements that Villarreal made and Casarez condoned were completely false
> and without basis, and were intentionally made to induce—and did induce—Dr.
> Masel and by extension, Mr. Chandiramani, to give up substantial portions of their
> businesses to the Defendants in each of the Plaintiff Entities and to lure the
> [Plaintiffs] to set up an enterprise that Defendants could later steal." (Dkt. #49
> at ¶ 60).

> "Specifically, Defendants, via a pattern of fraudulent and racketeering activity,
> utilized the IOM Enterprise to defraud Plaintiffs by continuing to represent (or
> omitting to correct) that they could collect $50,000 to $75,000 for each
> out-of-network case, that the reimbursement cycle was only six months, and that
> Plaintiffs could expect to recover 50% of the accounts receivable." (Dkt. #49
> at ¶ 280).

Taking such allegations as true, Plaintiffs' amended complaint alleges an enterprise—IOM

Enterprise—exists for the purpose of defrauding Plaintiffs. This is insufficient to plead that an

enterprise "exist[s] for purposes other than just to commit predicate acts." *Walker v. Beaumont*

*Ind. Sch. Dist.*, No. 1:15-CV-379, 2017 WL 928459, at *7 (E.D. Tex. Mar. 6, 2017), *report and*

*recommendation adopted*, 2017 WL 1166779 (E.D. Tex. Mar. 28, 2017) (citing *In re McCann*,

286 F. App'x 359, 366 (5th Cir. 2008)); *accord Whelan*, 319 F.3d at 229; *Zastrow*, 789 F.3d at

562.[10]

---

[10] *See also Handeen v. Lemaire*, 112 F.3d 1339, 1352 (8th Cir. 1997) ("[I]n assessing whether an alleged enterprise
has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is our normal practice to
determine if the enterprise would still exist were the predicate acts removed from the equation.").

However, assuming the IOM Enterprise exists separate and apart from the alleged predicate acts, Plaintiffs fail to sufficiently plead the necessary structural features required in an association-in-fact enterprise. "An 'enterprise' must have some longevity." *Boyle*, 556 U.S. at 946. In fact, "[c]ontinuity or the ongoing nature of an association-in-fact is the linchpin of enterprise status." *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1462 (5th Cir. 1991).

In the Spring of 2016, "MPS, IOS Management, and CGR Investments unilaterally terminated their respective contracts with Neuron Shield." (Dkt. #49 at ¶¶ 123). Subsequently, due to "the IOM Enterprise's racketeering activities," Neuron Shield "cease[d] operations due to Defendants' violations of the RICO statute[s]." (Dkt. #49 at ¶¶ 293, 306). Based on Plaintiffs' allegations, the association as alleged maintained one short-term goal—defraud Plaintiffs by redirecting and stealing Plaintiffs' business opportunities—which, once achieved, resulted in disbandment. As a result, IOM Enterprise "lacks the continuity required of RICO enterprises." *Manax*, 842 F.2d at 811. Moreover, this further illustrates the point above that there is "nothing linking the members of the association to one another except the commission of the predicate acts." *Id.*

Regarding the second enterprise Plaintiffs allege—Villarreal's and Casarez's other IOM businesses—the Court finds Plaintiffs failed to properly and sufficiently plead its alleged existence. To support their assertion, Plaintiffs point to paragraphs fifty-five and sixty-one in their amended complaint (Dkt. #49). These paragraphs state:

> Neither Villarreal nor Ca[s]are[z] informed Masel or Chandiramani that they in fact had no secret sauce, that their scheme included paying the CNIMs themselves and seeking reimbursement from Neuron Shield for the salaries and benefits paid to the CNIMs while diverting those CNIMs' work and revenue elsewhere. They also failed to inform Plaintiffs that they intended to divert referrals from doctors for IOM business to their own entities and deprive Plaintiffs of their allotted share.

During the discussions that led to the formation of Neuron Shield, Villarreal and Casarez failed to disclose to Masel and Chandiramani that they vested financial interests in scores of other IOM providers that would be competing with Neuron Shield.

(Dkt. #49 at ¶¶ 55, 61). The Court finds such allegations fail to "plead specific facts" establishing the necessary components and existence of an enterprise. *Montesano*, 818 F.2d at 427. a

Because Plaintiffs failed to properly plead the existence of a RICO enterprise, the Court finds that their RICO claims—Counts five, six, and seven—should be dismissed. Since the Court finds dismissing all of Plaintiffs' federal claims is warranted, the Court now addresses Defendants' 12(b)(1) argument.

## II.    Rule 12(b)(1)

Defendants contend that should the Court dismiss Plaintiffs' federal claims, "the Court should refrain from exercising supplemental jurisdiction over the state claims and dismiss the case at large." (Dkt. #75 at p. 19).

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A district court maintains the discretion to decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In deciding whether to exercise supplemental jurisdiction, the Court balances "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "Nonetheless, the 'general rule' of the Fifth Circuit is 'to dismiss state claims when the federal claims to which they are pendent are dismissed.'" *Pisharodi v. Columbia Valley Healthcare Sys., L.P.*, No. 1:14-CV-4, 2015 WL 11123315, at *3 (S.D. Tex. Jan. 29, 2015) (quoting *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992)).

Applying the aforementioned factors, the Court finds declining to exercise supplemental jurisdiction is proper in this case. The case remains in the early stages of litigation, the Court has not addressed the merits of Plaintiffs' state law claims, and there is no indication that dismissal prejudices the litigants. As such, the Court finds Plaintiffs' state claims should be dismissed without prejudice. *See Brookshire Bros. Holdings, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) ("[A] court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial.").

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to Federal Rules 12(b)(6), 9(b), and 12(b)(1) (Dkt. #65), is hereby **GRANTED.** As a result, Plaintiff's Securities Fraud and RICO claims (Counts 1, 5, 6, 7) are **DISMISSED with prejudice.** Further, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state claims. As such, it is further **ORDERED** that Plaintiffs' remaining state claims are **DISMISSED without prejudice.**

**SIGNED this 18th day of April, 2018.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE